272 B.R. 846 (2002)
In re KAISER GROUP INTERNATIONAL, INC., et al., Debtors.
Kaiser Group International, Inc., et al., Plaintiffs,
v.
Nova Hut, a.s. and International Finance Corporation, Defendants.
Bankruptcy Nos. 00-2263 to 00-2301(MFW). Adversary No. 01-928 (EIK).
United States Bankruptcy Court, D. Delaware.
January 2, 2002.
*847 Robert J. Stearn, Jr., Richards, Layton & Finger, P.A., Wilmington, DE, Lawrence E. Rifken, Waller Dudley, Thomas E. Spahn, McGuire Woods LLP, Richmond, VA, for International Finance Corporation.
Laura S. Wertheimer, Shea & Gardner, Washington, DC, for Wilmer, Cutler & Pickering.
Mark Minuti, Saul Ewing, LLP, Wilmington, DE, Paul J. Mode, M. Carolyn Cox, Wilmer, Cutler & Pickering, Washington, DC, for Kaiser International, Inc., et al.

MEMORANDUM OPINION
ERWIN I. KATZ[1], Bankruptcy Judge.
This matter comes before the Court on the motion of the International Finance *848 Corporation (the "IFC") to disqualify Wilmer, Cutler & Pickering ("Wilmer") from representation of Kaiser Group International Inc., et al. ("Debtors") in this adversary proceeding. The IFC asserts two alternate arguments for the disqualification. The first, that Wilmer's representation of Debtors is in violation of Rule 1.7 of the ABA Model Rules of Professional Conduct ("Rule 1.7.") The second, that the representation is in violation of Rule 1.9 of the ABA Model Rules of Professional Conduct ("Rule 1.9.") For the reasons that follow, the motion is denied.

BACKGROUND
On or about June 27, 1997 Nova Hut a.s. ("Nova Hut"), one of the defendants in this adversary, entered into a contract (the "Contract") with ICF Kaiser Netherlands B.V. ("Kaiser Netherlands"), a nondebtor subsidiary of Debtors, for the design and construction of phase 1 of a flat roll products minimill by Kaiser Netherlands for the benefit of Nova Hut. Debtors guaranteed the performance by Kaiser Netherlands and pledged assets for a letter of credit issued by Corestates Bank, N.A.[2] as an additional guarantee of the Contract. The IFC loaned funds to Nova Hut for the project and in exchange was given a conditional assignment of Nova Hut's rights under the Contract and Debtors' guarantee.
On June 9, 2000 Debtors filed their Chapter 11 petitions with this Court. Nova Hut and the IFC filed separate claims against the estate relating to Debtors' guarantee of the Contract.
The Contract between Kaiser Netherlands and Nova Hut contains provisions regarding required performance levels. In October and November of 2000 the performance tests were conducted by Kaiser Netherlands. The parties dispute whether the minimill passed the tests. On or about February 16, 2001 Nova Hut drew on the line of credit that was secured by Debtors' assets.
The instant adversary was filed on April 8, 2001 by Debtors. In the adversary Debtors object to the claims of Nova Hut and the IFC and assert as counterclaims under Bankruptcy Rule 3007[3] causes of action against Nova Hut and the IFC related to the Contract and the allegedly wrongful draw on the line of credit by Nova Hut.
The following facts were taken from the affidavits provided by the parties in connection with the motion before the Court.
The IFC utilizes the services of various law firms. In early 2000 Wilmer was engaged by the IFC to provide legal services for what the parties refer to as the "barrier matter." Wilmer was paid an advance retainer to be applied against future billings. The barrier matter involved recommendations on how the IFC could erect an information barrier for its equity desk. On May 25, 2000 Wilmer provided a draft memorandum to the IFC. Sometime thereafter, in September, the IFC requested more time to review the memorandum and its position as to the need for further work.[4] There is no dispute that an attorney-client relationship existed between Wilmer and the IFC.
*849 In February of 2001 William Perlstein, a partner with Wilmer, was approached by Debtors about representation for certain matters related to disputes with Nova Hut. Mr. Perlstein was informed that the IFC had guaranteed a loan to Nova Hut and had filed a proof of claim against Debtors. No other details of the initial discussions between Wilmer and the Debtors have been supplied to the Court. Wilmer performed a client conflict search and discovered a conflict with their representation of the IFC. Wilmer subsequently contacted the IFC to inquire about the status of the barrier matter.[5]
On March 1, 2001 Wilmer sent a letter to the IFC terminating its representation and returning the balance remaining from the retainer. On March 6, 2001 Wilmer agreed to represent Debtors. On April 8, 2001 Wilmer filed the adversary against Nova Hut and the IFC.
On April 20, 2001 Carol Lee, General Counsel of the IFC, called Mr. Perlstein of Wilmer to discuss the representation. During this conversation Ms. Lee requested the implementation of a "Chinese Wall," an information wall intended to insulate those Wilmer attorneys who had been involved in immunities matters for the IFC or the World Bank from those attorneys involved in the litigation. Wilmer agreed to the request and the wall was established by Wilmer on April 23, 2001. The establishment of the wall was confirmed to the IFC. On May 7, 2001 the IFC cashed the March 1, 2001 partial refund retainer check.
At a hearing before this Court on June 3, 2001 counsel for the IFC represented to the Court for the first time that it was considering filing a motion to disqualify Wilmer. There was further communication between Wilmer and the outside attorneys for the IFC in mid June. On August 2, 2001 the IFC filed its motion to disqualify Wilmer.

APPLICABLE RULES
Local Rule 1001-1 of the Bankruptcy Court for the District of Delaware provides that the Local Rules of the United States District Court for the District of Delaware shall apply. Del.Bankr.LR 1001-1. Local Rule 83.6 of the District Court for the District of Delaware provides that attorneys who practice before the court shall be governed by the Model Rules of Professional Conduct of the American Bar Association. D.Del.LR 83.6(d)(2); Elonex I.P. Holdings, Ltd. v. Apple Computer, Inc., 142 F.Supp.2d 579, 582 (D.Del.2001).
Rule 1.7 states the following:
Conflict of Interest: General Rule:
(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
(2) each client consents after consultation.
(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyers' responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
(1) the lawyer reasonably believes the representation will not be adversely affected: and

*850 (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.
Model Rules of Prof'l Conduct R. 1.7.
Rule 1.9 states:
Conflict of Interest: Former Client:
(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.
(B) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client
(1) whose interests are materially adverse to that person: and
(2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter;
unless the former client consents after consultation.
(C) A lawyer who has formerly represented a client in a matter shall not thereafter:
(1) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or rule 3.3 would permit or require with respect to a client, or when the information has become generally known; or
(2) reveal information relating to the representation except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client.
Model Rules of Prof'l Conduct R. 1.9.

DISCUSSION
The Court's power to disqualify an attorney stems from the inherent authority to supervise the attorneys appearing before it. In re Corn Derivatives Antitrust Litig., 748 F.2d 157, 160 (3rd Cir.1984); U.S. v. Miller, 624 F.2d 1198, 1201 (3rd Cir.1980). The exercise of this authority is committed to the discretion of the Court. Miller, 624 F.2d at 1201. A court should disqualify an attorney only when the facts of a particular case warrant disqualification as an appropriate means of enforcing the applicable disciplinary rule. Id. A court "should consider the ends that the disciplinary rule is designed to serve and any countervailing policies." Id.
The question before the Court is whether Wilmer should be disqualified from representing Debtors in this adversary case. The IFC asserts that Wilmer should be disqualified under Rule 1.7 because it undertook a representation directly adverse to the IFC, who was a client at the time Wilmer accepted the representation of Debtors. In the alternative, if the Court determines that IFC was not a client at the time of the alleged conflict, the IFC asserts that Wilmer's representation of Debtors is in violation of Rule 1.9 because the representation is "substantially related" to its long standing representation of the IFC, namely counsel on immunities issues.
Timing of Conflict
It is important to first assess the timing of any conflicts and their sequence among the other events. In this case a conflict may have occurred either 1) on February 22, 2001 when Debtors first contacted Wilmer or 2) on March 6, 2001 when Wilmer accepted the representation of Debtors.
*851 On or about February 22, 2001 Mr. Perlstein of Wilmer was contacted by Debtors regarding the new representation. In order to determine whether Wilmer became conflicted at that point the Court would need to inquire into the particulars that were divulged to Wilmer by Debtors. Wilmer did proceed to do a "conflict" check but did not promptly advice IFC of any potential conflict. The Court has little information as to the extent of Wilmer's discussion with Debtors and so is unable to make a determination whether a conflict occurred or not.
On March 6 Wilmer accepted the representation of Debtors. Whether a conflict occurred as a result of this action depends on whether the relationship between Wilmer and the IFC had terminated. If the relationship was terminated then an analysis under Rule 1.9 of the current and former representations would be necessary.
Substantial Relationship
Rule 1.9 prohibits representation where such representation is materially adverse to the interests of a former client. Model Rules of Prof'l Conduct R. 1.9. In an analysis of Canon 4 of the ABA Model Code of Professional Responsibility the Third Circuit stated that disqualification of an attorney is required where the subject matter of the pending suit is such that the attorney may have acquired substantially related material during the course of the former representation. Am. Roller Co. v. Budinger, 513 F.2d 982, 984 (3rd Cir.1975). The Court's concern was, among other things, for the preservation of the confidences and secrets of the former client. Am. Roller Co., 513 F.2d 982. This "substantial relationship test," discussed by the Third Circuit and other courts, was essentially adopted by the ABA as Model Rule 1.9(a). Brice v. Hess Oil V.I. Corp., 769 F.Supp. 193, 195 (D.Vi.1990); 10 Geo. J. Legal Ethics 677, 678. Rule 1.9 "is a prophylactic rule to prevent even the potential that a former client's confidences and secrets may be used against him." In re Corn Derivatives, 748 F.2d at 162.
Assuming that the relationship between the IFC and Wilmer were properly terminated before any conflict existed, an analysis of the two representations would then be required to determine whether a substantial relationship exists. With respect to Wilmer's IFC representations on the barrier matter and immunities issues, the only work performed was legal advice and legal memoranda. There was no case assignment. There was no transactional representation. Creation of a legal memorandum is mere research and opinion.
The IFC asserts that because it raises immunity as a defense a conflict exists. The only supporting document provided to the Court that work was performed on immunities matters is a general memo prepared by Wilmer on immunity defenses. There are not sufficient allegations nor factual statements that would raise the disqualification under Rule 1.9. Nothing demonstrates any potential for the exchange of the IFC's confidences and secrets as a relation to this adversary.
Waiver of Conflict
This Court need not make a final determination on those questions. The Court finds that the IFC waived any conflict under either Rule 1.7 or Rule 1.9. Findings on the actual conflicts, termination and substantial relationship need not be made.
Both Rule 1.7 and Rule 1.9 provide that the attorney shall not be involved in a situation where a conflict exists unless the client(s) consent after consultation. Model Rules of Prof'l Conduct R. 1.7; Model Rules of Prof'l Conduct R. 1.9. "As a general matter, a client may expressly or impliedly waive his objection and consent *852 to an adverse representation." Elonex, 142 F.Supp.2d at 582. In the situation before the Court the IFC, fully informed, waived any conflict that may have existed or still exists through its request for a Chinese Wall.
Wilmer does not assert that it sought out a waiver at any time. As a result, there was no direct "consultation" as required by Rules 1.7 and 1.9. However, as of April 20, 2001, the date of the IFC's request for the Chinese Wall, the IFC had received the March 1, 2001 letter from Wilmer explaining the termination and was fully aware of the adversary filed against them on April 8, 2001. As of April 20, 2001 there was nothing more to be disclosed. The IFC's understanding of the situation is evidenced by the fact that the request for the Chinese Wall was directed to those attorneys who had worked on immunities matters.
The waiver by the IFC occurred when the IFC requested the Chinese Wall and Wilmer established the wall without any further objection from the IFC on April 23, 2001. The affidavits provide that there was no further discussion of the conflict until the matter was raised before the Court at the June 3, 2001 hearing by the IFC's outside counsel. The representative of the client in this case was General Counsel for the IFC[6], an attorney trained and experienced in determining the best interests of her client. Given the parties involved, there is no reason to make an inquiry into the reasonableness of the waiver.
The Court further finds that the IFC's delay in filing its motion to disqualify was not justified. Wilmer sent the termination letter on March 1, 2001 and the Adversary was filed on April 8 yet on April 20, 2001 the IFC called Wilmer to request that Wilmer rectify the matter by a Chinese Wall and that request was implemented. There was yet another delay from the April 23 implementation of the Chinese Wall to the June 3 hearing and then again to the mid June correspondence between the IFC's outside counsel and Wilmer. Again a delay from the mid June discussions to the filing of the motion to disqualify on August 2, 2001. The affidavits provide no support for the delays. The motion to disqualify is a strategic ploy to undo the waiver that was given by the IFC's internal counsel in April 2001.

CONCLUSION
For the foregoing reasons, the motion of the IFC to disqualify Wilmer Cutler & Pickering is denied.
NOTES
[1] Bankruptcy Judge for the Northern District of Illinois, sitting by appointment in the District of Delaware under an inter-circuit loan.
[2] Corestates Bank, N.A. was subsequently merged into First Union National Bank.
[3] "If an objection to a claim is joined with a demand for relief of the kind specified in Rule 7001, it becomes an adversary proceeding." Fed. R. Bankr.P. 3007 (emphasis added).
[4] The parties dispute what, if any, communication occurred between this time and the spring of 2001.
[5] It is unclear from the affidavits when the inquiry was made and when or if the IFC responded to this inquiry.
[6] The Court notes that in the latest edition of the ABA Journal Ms. Lee was profiled as Vice President and General Counsel of the IFC. A.B.A.J., Jan. 2002 at 42.